**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
**CENTRAL ISLIP DIVISION**

| | |
|---|---|
| JARI MAJEWSKI PRICE,<br><br>Plaintiff,<br><br>vs.<br><br>EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., and TRANS UNION LLC,<br><br>Defendants. | Civil Case No.: 2:26-cv-04188 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Jari Majewski Price ("Plaintiff") brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union LLC, ("Trans Union"), (collectively, "Defendants") and states as follows:

**INTRODUCTION**

1. Plaintiff, an identity theft victim, brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et. seq.

2. More than twenty million people, just under 10% of all adult Americans, are victims of identity theft each year.[1] Federal Law requires that each consumer reporting agency ("CRA"), including the Defendants, protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests. This lawsuit arises from

[1] Victims of Identity Theft, 2018, 1. U.S. Dept. of Justice, Bureau of Justice Statistics. April 2021, NCJ 256085.

Defendant's refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

3. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

4. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

7. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

9. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not

prevent said consumer from benefiting from his or her credit and obtaining new credit.

11. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U. S.C. § 1681(a)(4).

12. The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

13. Plaintiff's claims arise out of the Defendants plainly deficient reinvestigations considering Plaintiff's multiple disputes and repeated notice that she was a victim of identity theft.

14. Accordingly, Plaintiff brings claims against the Defendants, for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, and for failing to block the identity theft items as disputed and supported by Plaintiff in violation of the FCRA, 15 U.S.C. § 1681c-2.

15. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

## JURISDICTION AND VENUE

16. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because

Plaintiff alleges violations of the FCRA, a federal law. See 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

18. Plaintiff is a natural person residing in Oyster Bay, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

19. Defendant Equifax is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of New York, including within this District.

20. Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d)) to third parties.

21. The information that Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

22. Equifax collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Equifax collects and maintains information about them. Not only that, but consumers cannot remove information that

Equifax collects and maintains about them from the Equifax database. Further, Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Equifax sold.

23. Defendant Experian is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California, 92626 and is authorized to do business in the State of New York, including within this District.

24. Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

25. The information that Experian collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Experian also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

26. Defendant Trans Union is a corporation with a principal place of business located at 555 West Adams Street, Chicago, IL 60661, and is authorized to do business in the State of New York, including within this District.

27. Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

28. The information that Experian, Equifax, and Trans Union collect, maintain, and sell

include confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Experian, Equifax, and Trans Union also collect consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

**SUMMARY OF THE FAIR CREDIT REPORTING ACT**

29. The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

30. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

31. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. See 15 U.S.C. § 1681(b).

32. Congress also recognized that CRAs such as Defendants "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

33. For that reason, Congress ensured that the FCRA also provides special protections

for victims of identity theft.

34. The first form of protection is the "block." When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the reporting of that information within four business days, provided the consumer submits:

a. Appropriate proof of the identity of the consumer;

b. A copy of an identity theft report;

c. The identification of such information by the consumer; and,

d. A statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).15 U.S.C. § 1681c-2(a).

35. The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

36. Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer, and provide that alert along with any credit score generated in using that file, for one year beginning on the date of the request. Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

37. The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the Defendants here.

38. A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report.[2] 15 U.S.C. § 1681c-

[2] Certain statutorily exempt entities can still request and receive a frozen report. See 15 U.S.C. § 1681c-1(i)(4). But those exemptions do not apply to the matter at hand.

1(i)(1). Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

39. Once placed, a security freeze does not expire. A CRA can remove a security freeze **only** at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A). Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze." 15 U.S.C. § 1681c-1(i)(3)(C).

40. The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may **only** release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit. 15 U.S.C. § 1681b(c). No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose. 15 U.S.C. § 1681e(a).

41. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

42. The FCRA provides consumers with a private right of action against consumer reporting agencies, such as the Defendants, that willfully or negligently fail to comply with their

statutory obligations under the FCRA.

## FACTUAL ALLEGATIONS

### Identity Theft

43. On or about October 18, 2022, and again on August 29, 2023, an unauthorized individual ("Fraudster") applied for federal student loans through the U.S. Department of Education serviced by Aidvantage using Plaintiff's personal identifiers, including her name, Social Security number, and date of birth, without her consent, knowledge, or authorization.

44. Specifically, the Fraudster fraudulently opened the following student loan accounts under the name "Jari B. Majewski" (the "Fraudulent Accounts"), as follows:

a. Account No. 53701XXXXX, opened August 29, 2023;
b. Account No. 953701XXXXX, opened October 18, 2022;
c. Account No. 953701XXXXX, opened August 29, 2023; and
d. Account No. 953701XXXXX, opened October 18, 2022.

45. Plaintiff did not apply for, authorize, or benefit from any of the Fraudulent Accounts.

46. Plaintiff has never borrowed funds from Aidvantage or the Department of Education in connection with the Fraudulent Accounts.

### Plaintiff's Discovery of the Fraudulent Accounts

47. Beginning in or around 2025, Plaintiff and her husband decided to begin searching for a mortgage to finance the purchase of a new family home closer to their relatives after the births of their two children.

48. Around the same time, Plaintiff was confused to receive a bill from Aidvantage in connection to the Fraudulent Accounts.

49. On or about March 25, 2025, Aidvantage sent Plaintiff account-related correspondence concerning student loans that Plaintiff did not recognize.

50. In its March 25, 2025, correspondence, Aidvantage stated that it did not have Plaintiff's current email address and that the email address it had on file was no longer valid.

51. In separate correspondence also dated March 25, 2025, Aidvantage stated that prior letters had been returned by the post office because of an invalid address and that, now that Aidvantage had what it described as an accurate address, it wanted Plaintiff to receive information regarding the student loans.

52. Plaintiff was confused and alarmed because, as of that time, she had not applied for, opened, authorized, used, or benefited from any student loans serviced by Aidvantage.

53. Worried by the consecutive bills she received for student loans she did not recognize, Plaintiff requested copies of her consumer files from Defendants.

54. In or around April 2025, Plaintiff obtained copies of her credit reports and upon review, saw that the Fraudulent Accounts were reporting to her consumer files and reports.

55. Plaintiff was alarmed by what she discovered because Defendants were reporting student loan accounts that Plaintiff had not applied for, opened, authorized, used, or benefited from.

56. Plaintiff became concerned that someone had used her identity to obtain student loans in her name.

57. On or about April 3, 2025, Plaintiff filed a police report with the City of Englewood Police Department for identity theft with regards to the Fraudulent Accounts.

**Plaintiff Contacts Aidvantage**

58. In or around April 2025, after filing the police report, Plaintiff contacted Aidvantage by telephone regarding the Fraudulent Accounts.

59. During that call, Plaintiff reported that the Fraudulent Accounts were the product of identity theft and forgery.

60. On or about April 9, 2025, Aidvantage sent Plaintiff written correspondence acknowledging Plaintiff's call regarding her potential identity theft and forgery claim.

61. In the same correspondence, Aidvantage instructed Plaintiff that, to continue its investigation, Plaintiff needed to submit information on a forgery discharge application and provide supporting documentation, including an identity theft report filed with a local or state police department, another law enforcement agency, or the Department of Education Office of Inspector General.

62. On or about May 23, 2025, Aidvantage sent Plaintiff additional correspondence stating that it needed more information to investigate her claim and determine her eligibility for discharge.

63. Aidvantage stated that Plaintiff's request for federal student loan discharge due to forgery was missing documentation, including signature samples, school records, and proof of address from around the time of the initial loan disbursement.

64. On or about June 8, 2025, Aidvantage sent Plaintiff correspondence stating that her loans were entering repayment and that her upcoming monthly payment amount was $164.56, with a due date of August 6, 2025.

65. Subsequently, on or about June 19, 2025, Plaintiff complied with Aidvantage's requests and submitted the additional information, including a completed "Loan Discharge Application: Forgery" concerning the Fraudulent Accounts.

66. By letter dated July 23, 2025, Aidvantage stated that it had closed Plaintiff's identity theft claim and stated that the result of its dispute did not change the underlying obligation on the debt.

67. Aidvantage further stated that it would update Plaintiff's credit report to reflect the

following comment: "FCRA direct dispute investigation completed - consumer disagrees with the results of the data furnisher's investigation."

68. Despite Plaintiff's identity theft and forgery claims, Aidvantage continued to treat Plaintiff as responsible for student loan accounts that Plaintiff did not apply for, open, authorize, use, or benefit from.

69. Aidvantage also continued reporting or caused information concerning the Fraudulent Accounts to remain reported to one or more consumer reporting agencies.

**Plaintiff Obtains Her Credit Reports and Confirms the Continued Reporting of the Fraudulent Accounts in Plaintiff's Consumer Files**

70. In or around December 2025 and January 2026, Plaintiff obtained and reviewed copies of her consumer reports and confirmed that the Fraudulent Accounts were still being reported in her consumer files.

71. Plaintiff was worried and scared because the Fraudulent Accounts continued to appear as obligations belonging to her even though she had disputed the accounts with Aidvantage as the product of identity theft and forgery.

72. On or about February 10, 2026, Aidvantage sent Plaintiff correspondence stating that her student loan account was more than two months past due and that Plaintiff needed to pay $328.90 to bring the account current.

73. In the same correspondence, Aidvantage warned that unpaid student loans could result in consequences including credit reporting, default, increased debt, wage garnishment, tax refund offsets, and legal action.

74. Aidvantage's February 10, 2026, correspondence further confirmed that Aidvantage continued to treat Plaintiff as responsible for the Fraudulent Accounts despite Plaintiff's prior identity theft and forgery claim.

75. Thereafter, Plaintiff obtained copies of the promissory note documents associated with the Fraudulent Accounts.

76. Upon review of the promissory note documents, Plaintiff confirmed that the loan documents contained personal identifying and contact information that did not belong to her, including a Louisiana address, an email address, a telephone number, a Louisiana school, and Louisiana references.

77. The promissory note documents listed a Louisiana address as the borrower's address, even though Plaintiff has never lived at that address.

78. The promissory note documents listed an email and telephone number, neither of which belonged to Plaintiff.

79. The promissory note documents identified Delgado Community College in New Orleans, Louisiana as the school associated with the loans, even though Plaintiff never attended Delgado Community College.

80. The promissory note documents reflected that the Master Promissory Note was electronically signed and submitted on or about September 29, 2022.

81. Plaintiff did not electronically sign the Master Promissory Note and did not authorize anyone to electronically sign the Master Promissory Note on her behalf.

82. Plaintiff did not apply for, open, authorize, use, or benefit from any student loan associated with Delgado Community College.

83. On or about February 26, 2026, Plaintiff filed an FTC Identity Theft Report regarding the Fraudulent Accounts.

**Plaintiff's Disputes with Defendants in March 2026**

84. Concerned that Aidvantage would continue to report, verify, and treat Plaintiff as responsible for student loan accounts that she did not apply for, open, authorize, use, or benefit

from, Plaintiff determined that she needed to escalate the issue to Defendants.

85. In March 2026, Plaintiff, disputed the Fraudulent Accounts with Defendants Experian, Equifax, and Trans Union, via certified mail,

86. In her disputes, Plaintiff informed the Defendants that the Fraudulent Accounts were not hers and were the product of fraud and identity theft.

87. Plaintiff provided sufficient information to identify her credit file and sufficient information to support her dispute.

88. Plaintiff requested that the identity theft information be blocked from her credit file.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

89. On or about March 12, 2026, Defendant Equifax acknowledged receipt of Plaintiff's dispute.

90. In its March 12, 2026, communication, Defendant Equifax stated that it would not block the Fraudulent Accounts as per Plaintiff's request.

91. Upon information and belief, Defendant Equifax sent Aidvantage an automated credit dispute verification ("ACDV") pursuant to Plaintiff's March 2026 dispute.

92. On or about March 17, 2026, Defendant Equifax issued dispute results to Plaintiff.

93. In its dispute results, Defendant Equifax removed certain inaccurate personal identifying information, including unrecognized phone numbers and names.

94. However, Defendant Equifax erroneously verified that the four Fraudulent Accounts belonged to Plaintiff.

95. On or about April 30, 2026, Plaintiff obtained an updated Equifax consumer report.

96. The updated Equifax consumer report continued reporting the Fraudulent Accounts as belonging to Plaintiff.

97. The updated Equifax consumer report continued reporting the Fraudulent Accounts

as past due.

98. Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff.

99. Defendant Equifax failed to reinvestigate Plaintiff's March 2026 dispute and failed to block the identity theft information.

100. Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

101. Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

102. Upon information and belief, Defendant Trans Union received Plaintiff's March 2026 dispute.

103. Upon information and belief, Defendant Trans Union failed to send Aidvantage an ACDV pursuant to Plaintiff's March 2026 dispute to Defendant Trans Union.

104. Plaintiff did not receive a substantive response from Defendant Trans Union regarding its investigation of her dispute.

105. On or about April 30, 2026, Plaintiff obtained an updated Trans Union consumer report.

106. The updated Trans Union consumer report showed that Defendant Trans Union removed the fraudulent mailing address from Plaintiff's consumer file.

107. However, Defendant Trans Union failed to remove the Fraudulent Accounts.

108. Defendant Trans Union further failed to place an identity theft block on the Fraudulent Accounts as per Plaintiff's request.

109. Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff.

110. Defendant Trans Union failed to reinvestigate Plaintiff's March 2026 dispute and failed to block the identity theft information.

111. Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

112. Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

**Defendant Experian's Unreasonable Dispute Reinvestigation**

113. On or about April 1, 2026, Plaintiff received an email response from Defendant Experian declining to block the disputed information from Plaintiff's consumer report.

114. Upon information and belief, Defendant Experian sent Aidvantage an ACDV pursuant to Plaintiff's March 2026 dispute to Defendant Experian.

115. Defendant Experian stated that Plaintiff's block request was either made in error, based on a material misrepresentation, or related to transactions from which Plaintiff may have obtained goods, services, or money.

116. Defendant Experian also stated that Plaintiff's submitted documentation did not satisfy the requirements of the FCRA because Experian did not deem it to be a valid identity theft report filed with a law enforcement agency.

117. Defendant Experian further confirmed that it forwarded Plaintiff's dispute to the furnisher and requested a compliant identity theft report to proceed further.

118. On or about April 6, 2026, Plaintiff received another update from Defendant

Experian indicating that all four student loan accounts were pending.

119. On or about April 22, 2026, Plaintiff received another dispute update from Defendant Experian indicating that the information on all four student loan accounts had been updated.

120. On or about April 30, 2026, Plaintiff obtained an updated Experian consumer report.

121. The updated Experian consumer report showed that Defendant Experian removed the fraudulent Louisiana mailing address from Plaintiff's consumer file.

122. However, Defendant Experian failed to remove or block the Fraudulent Accounts.

123. Defendant Experian failed to reinvestigate Plaintiff's March 2026 dispute and failed to block the identity theft information.

124. Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

125. Defendant Experian violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

**Plaintiff Applies for a Mortgage in April 2026**

126. Still needing a place to live after coming over to New York, Plaintiff and her husband began the process of applying for a mortgage.

127. Plaintiff was hoping to obtain a mortgage that would allow her and her husband to provide a home for their two young daughters.

128. In or around early April 2026, Plaintiff and her husband applied for a mortgage through non-party United Mortgage Corp. ("United Mortgage").

129. On or about April 16, 2026, United Mortgage Corp. issued a pre-approval letter to Plaintiff and her husband in connection with their request to finance the purchase of a residential property. The pre-approval identified a purchase price of $1,300,000.00, a base loan amount of $750,000.00, and a 360-month conventional loan term.

130. However, in order to completely evaluate Plaintiff's application for a mortgage, United Mortgage obtained a copy of Plaintiff's credit report from non-party Xactus.

131. Xactus ordered copies of Plaintiff's credit reports from each of the Defendants, which included the Fraudulent Accounts, and resold the information in a credit report to United Mortgage.

132. In connection with Plaintiff's mortgage process, a United Mortgage Corp. representative confirmed that lower credit scores generally result in higher interest rates, less favorable loan terms, and increased overall borrowing costs, and further confirmed that Plaintiff's lower personal credit score directly impacted her mortgage loan terms.

133. On or about May 8, 2026, United Mortgage Corp. further explained that Plaintiff had experienced significant financial harm as a result of the fraud information appearing in her credit files, that the fraudulent activity negatively impacted her credit profile, and that the resulting reduction in her credit score affected the mortgage financing terms available to Plaintiff and her husband.

134. United Mortgage Corp. further stated that Plaintiff's credit score had deteriorated to below 600, resulting in significant loan-level pricing adjustments and less favorable financing terms than would otherwise have been available if Plaintiff's score remained in a stronger credit tier.

135. United Mortgage Corp. estimated that the credit-score impact resulted in additional

upfront cost of at least $28,400 to obtain the same rate Plaintiff otherwise would have qualified for, or, alternatively, a higher adjusted interest rate that could increase the monthly payment by approximately $858.00 and increase the total cost over the life of a 30-year mortgage by approximately $308,880.00.

136. As a result of Defendants' inaccurate reporting of the Fraudulent Accounts, Plaintiff was approved for a mortgage at a significantly smaller amount than she had anticipated.

137. Specifically, Plaintiff had applied for a mortgage of $1,300,000.00 but was only approved for $750,000.00.

138. Upon information and belief, Plaintiff was approved with a higher interest rate than she otherwise would have qualified for had Defendants not included the Fraudulent Accounts in her reports.

139. By reporting the Fraudulent Accounts in the consumer reports presumably about Plaintiff to Xactus in connection with her mortgage application, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's consumer file and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's Damages**

140. Plaintiff did exactly what she should have done upon realizing she was the victim of identity theft.

141. Plaintiff disputed directly with Aidvantage on multiple occasions and explained that the Fraudulent Accounts were fraudulently opened and that she was the victim of identity theft.

142. Plaintiff filed a police report and an FTC ID Theft Report.

143. Plaintiff disputed with Defendants and requested that the Fraudulent Information be removed and/or blocked her from credit report.

144. Defendants failed to block the Fraudulent Accounts that was the product identity theft despite Plaintiff's multiple disputes.

145. Instead, Defendants repeatedly disregarded Plaintiff's credible disputes. Often responding to a victim of identity theft that the furnisher of the account that was the product of identity theft had verified the account as accurate.

146. Defendants understand it is often the case that an identity thief's activities, often designed intentionally to fabricate information into a credit file, will cause false information to appear on an identity theft victim's credit file.

147. Despite Plaintiff's disputes to Defendants that the Aidvantage student loan accounts were the product of fraud, and that she was a victim of identity theft, Defendants Equifax, Experian, and Trans Union hardly waivered in their refusals to block and deleted the information.

148. As a direct result of the Defendants' ardent refusal to block the Fraudulent Account, which was a product of identity theft, Defendant Equifax has continued to saddle Plaintiff with fraudulent student loan accounts that were the product of identity theft.

149. Due to Defendants' ardent refusals to comply with their respective obligations pursuant to the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which she incurred attorney's fees.

150. Further, and due to Defendants' inexplicable refusal to block the Fraudulent Accounts from an identity theft victim's consumer file, Plaintiff expended countless hours disputing the same with Defendants to no avail.

151. As a result of Defendants' continued inaccurate reporting of the Fraudulent Accounts, Plaintiff was approved for a mortgage with less favorable terms than she otherwise would qualify for.

152. Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate her disputes.

153. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

154. At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

155. Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly receiving one non-responsive communication after another from Defendants, Plaintiff feels a surge of panic each time she receives another communication from Defendants. Her ongoing stress and anxiety regarding the situation have affected her and her relationships negatively.

156. Defendants have a long history of disregarding the credit reporting rights of identity theft victims under the FCRA. For example, in the very similar matter of *April Hendrix vs. Equifax, et. al.*, (N.CM.D. C.A. No. 1-16-cv-201), an identity theft victim sued several CRAs, including Defendants Equifax, Experian, and Trans Union, over their repeated wrongful removal of security freezes, release of her credit reports for impermissible purposes, and refusal to properly reinvestigate disputed identity theft information on her credit reports.

157. The Hendrix suit put Defendants on notice several years ago that their respective policies and procedures for implementing security freezes and handling identity theft victims' requests and disputes were woefully inadequate.

158. Defendants have had years of notice in the form of federal lawsuits, despite it all,

Defendants did not take any better steps to protect the Plaintiff here.

159. The respective internal policies and procedures of Defendants do not appear to place any value on its obligations under the FCRA to report credit entries accurately, to reinvestigate carefully when notified of consumer disputes, and to avoid giving third parties access to consumers' reports without authorization or permissible purpose. Nor do Defendants' respective policies and procedures respect their statutory duties to enforce or at minimum add security freezes and fraud alerts as requested by the consumer.

160. As a standard practice, Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the data furnishers, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

161. Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants' violations of the FCRA are willful.

162. Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries

of Plaintiff as described in this complaint.

163. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the fraudulent student loan accounts that were the product of identity theft; and, the expenditure of labor and effort disputing and trying to the fraudulent student loan accounts that were the product of identity theft.

164. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

165. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

166. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

167. On at least one occasion after Plaintiff's dispute of the fraudulent information, Defendants prepared patently false consumer reports concerning Plaintiff.

168. Despite actual and implied knowledge that Plaintiff was the victim of identity theft,

Defendants readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff had a student loan accounts and that she was delinquent on at least one occasion.

169. Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

170. Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

171. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

172. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the student loan accounts that were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the student loan accounts that were the product of identity theft.

173. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendants.

174. Plaintiff reasonably believes that the continued reporting of the Fraudulent Accounts harmed her credit profile and contributed to her inability to access more favorable credit and mortgage terms.

175. Plaintiff's housing plans were also disrupted. Plaintiff and her husband were attempting to purchase a home for their growing family, but Plaintiff's damaged credit profile limited their available financing options and exposed them to less favorable borrowing terms

176. Defendants' conduct, actions, and inactions were willful, rendering Defendants Equifax, Experian, and Trans Union liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

177. Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

178. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

179. The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day limitation for the completion of such an investigation. Id.

180. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

181. On at least one occasion in 2026, Plaintiff disputed the inaccurate information with Defendants and requested that they correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to her, namely, the Fraudulent Accounts that were the product of identity theft which was a very stressful situation for the Plaintiff.

182. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Equifax conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

183. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Experian conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

184. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Trans Union conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

185. Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

186. Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable

investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

187. Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

188. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the fraudulent student loan accounts that were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the fraudulent student loan accounts that were the product of identity theft.

189. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendants.

190. Defendants' conduct, actions, and inactions were willful, rendering Defendants

liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

191. Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681c-2**
**Failure to Block Identity Theft Information**

192. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

193. Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

194. Defendant Experian violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

195. Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

196. Plaintiff submitted ample evidence of the fact that she was an identity theft victim. Plaintiff further supported the fact that she was an identity theft victim by providing to Defendants copies of the FTC IDT Report.

197. Defendants should have blocked the identity theft information but failed to do so at every turn.

198. As a result of Defendants ' conduct, action, and inaction, Plaintiff suffered damage by loss of ability to purchase and benefit from er good credit rating; detriment to er credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the fraudulent student loan accounts that were the product of identity theft; and, the

expenditure of labor and effort disputing and trying to remove the fraudulent student loan accounts that were the product of identity theft.

199. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendants.

200. Defendants' conduct, actions, and inactions were willful, rendering Defendants liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

201. Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a judgment awarding Plaintiff actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs and awarding Plaintiff such other and further relief as the Court may deem appropriate and proper.

## JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

Dated: New York,
July 13, 2026

**CONSUMER ATTORNEYS PLLC**

*/s/ David Pinkhasov*
David Pinkhasov, NY # 5925904
CONSUMER ATTORNEYS PLLC
68-29 Main Street
Flushing, NY 11367

T: (718) 701-4605
F: (718) 247-8020
E: dpinkhasov@consumerattorneys.com

*Attorneys for Plaintiff*
*Jari Majewski Price*